# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

ENABLE COMMERCE, INC.,

      Plaintiff,                        :            Case No. 3:09-cv-328

     -vs-                                          Magistrate Judge Michael R. Merz

                                             :

THE STANDARD REGISTER
 COMPANY, et al.,

      Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS'
## SUMMARY JUDGMENT MOTIONS

      This case is before the Court on the Summary Judgment Motions of Defendant Standard Register Company (Doc. No 41) and Defendant United Stationers (Doc. No. 51). Plaintiff opposes both Motions (Doc. Nos. 50, 56) and each Defendant has filed a Reply (Doc. Nos. 53, 59).

      Although summary judgment motions are classified as dispositive under the Magistrates Act, these Motions are amenable to decision by the Magistrate Judge because the parties have unanimously consented to plenary magistrate judge jurisdiction under 28 U.S.C. § 626(c).

## SUMMARY JUDGMENT STANDARD

      Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. On a motion for summary judgment, the movant has the burden of showing that there exists no genuine

1

issue of material fact, and the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970). Nevertheless, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment asserting that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law. Fed. R. Civ. P. 50). *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989). If, after sufficient time for discovery, the opposing party is unable to demonstrate that he or she can do so under the *Liberty Lobby* criteria, summary judgment is appropriate. *Id*. The opposing party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249-50, 106 S. Ct. at 2510-11 (citations omitted). "The mere possibility of a factual dispute is not enough." *Mitchell v. Toledo Hosp*., 964 F. 2d 577, 582 (6th Cir. 1992)(quoting *Gregg v. Allen-Bradley Co.,* 801 F. 2d 859, 863 (6th Cir. 1986). Therefore a court must make a preliminary assessment of the evidence, in order to decide whether the plaintiff's evidence concerns a material issue and is more than de minimis. *Hartsel v. Keys*, 87 F. 3d 795 (6th

Cir. 1996). "On summary judgment," moreover, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S. Ct. 993, 994, 8 L. Ed. 2d 176 (1962). Thus, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249, 106 S. Ct. at 2510.

The moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex,* 477 U.S. at 323;  *see also, Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (citation omitted). If the moving party meets this burden, the nonmoving party must go beyond the pleadings to show that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 587; *Martin v. Ohio Turnpike Comm'n.*, 968 F. 2d 606, (6th Cir. 1992), *cert. denied*, 506 U.S. 1054, 113 S. Ct. 979, 122 L.Ed.2d 133 (1993).

In ruling on a motion for summary judgment (in other words, determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Interroyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied,* 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, a court is entitled to rely only upon those portions of the verified pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

All findings of fact made herein are based on materials properly filed under Fed. R. Civ. P.

56 and are uncontested or uncontradicted.

## Applicable Substantive Law

The pleadings establish that the parties to this case are of diverse citizenship, Texas, Ohio, and Illinois (Complaint, Doc. No. 1, ¶¶ 1.1, 1.2, 1.3).  The Court therefore has subject matter jurisdiction of this action under 28 U.S.C. § 1332, as pled by Plaintiff.  *Id.*  ¶ 2.1.  Subject matter jurisdiction is not contested by the Defendants.

A federal court exercising supplemental or diversity subject matter jurisdiction over state law claims must apply state substantive law to those claims.  28 U.S.C. §1652; *Gasperini v. Center for Humanities, Inc.*, 528 U.S. 415, 427, n. 7 (1996); *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), overruling *Swift v. Tyson*, 41 U.S. 1 (1841)(Story, J., holding that "the laws of the several states" in the Judiciary Act of 1789 means only the statutory law of the States).

In a diversity action, the district court is obliged to apply the choice of law rules of the State in which it sits.  *Klaxon v. Stentor Electric Mfg. Co*., 313 U.S. 487 (1941);  *Boyd v. LaMaster,* 927 F.2d 237 (6th Cir. 1991); *Macurdy v. Sikov & Love, P.A.,* 894 F.2d 818 (6th Cir. 1990).  In general Plaintiff pleads contract claims against Standard Register and tort claims against United Stationers. No party has sought a determination from the Court of which substantive law applies to any of the claims.  All parties have briefed the legal questions presented by the summary judgment motions under both Texas and Ohio law and it does not appear that the law of those two States differs materially as it applies to the causes of action pled in this case.  In the following analysis, the Court cites Ohio law except where the Court finds Texas law differs materially.

**Standard Register's Motion**

Plaintiff alleges it entered into a binding contract with Standard Register "to provide office products for Standard Register's national sales program of office products." (Complaint, Doc. No. 1, ¶ 4.2). Alternatively, Enable relies on the doctrine of promissory estoppel to recover damages for the same transaction (Complaint, ¶¶ 4.5 - 4.8).

Standard Register's Motion demonstrates that it is in the business of document management for its customers, including selling them forms, labels, toner, and inkjet printing supplies – items to be found in standard office supply stores such as Office Depot and Staples.[1] It does not sell other office supplies such as pens, pencils, paperclips, file folders, etc. However, for a short time from 1998 to 2001 Standard Register did sell such items, leaving the market in 2001 as a result of a decision not to compete with the big box office supply stores.

An entity known as BizSupplies, Inc., not a party to this action, sells traditional office supplies and targets as customers firms such as Standard Register which are not selling such products but are re-selling related products. BizSupplies' president is Rusty Wood who runs the company from his home.

Enable was formed in part because BizSupplies had credit problems and its owners wanted to have a separate company with good financials. Its target market was the same as BizSupplies and it is also run out of Mr. Wood's home, although it has no customers. Its two employees are Mr. Wood, its president, and Mike Crist, its chairman.

In January, 2008, Wood contacted Jonathan Craig Hogan at Standard Register at the suggestion of Mr. Crist. Hogan thought it would be a good idea for Standard Register to get back

---

[1] The Motion does not indicate any way in which Standard's forms and labels may be customized as they are sold to particular customers.

into the traditional office supplies business. He testified he made it clear to Wood, however, that any such expansion of the Standard Register business would require approval of upper management, that he had no authority to commit Standard Register to a deal or program.

Mr. Hogan had no employees working for him. In order for Standard Register to get back into the traditional office supplies business, Standard Register would have to direct any orders it received to a vendor/supplier who would then have the products drop-shipped by a wholesaler to the customer. In the deal which Wood and Hogan were discussing, Enable was to be the vendor and some other entity, potentially United Stationers, would have been the wholesaler. United Stationers is in the office supply business as a wholesaler and was already selling to both Standard Register and BizSupplies.

On April 8, 2008, an entity known as Azerty contacted Mr. Hogan in an effort in competition with Enable to become a vendor to Standard Register for traditional office supplies. Hogan apparently told Wood of the contact and Wood approached Larry Brooks, a supervisor of United Stationers account managers in the Southwest region, about putting together a program in which Enable and United would compete with Azerty for the Standard Register business.

By early May, 2008, Hogan requested a Dun & Bradstreet report on Enable and requested Wood to complete a Standard Register Supplier Requirements form to apply to become a Standard Register vendor. Wood did so.

On June 17, 2008, a meeting took place between Standard Register (represented by Hogan and his senior managers, Lisa Cupp, Brad Cates, and Jeffrey Strasser) and United (represented by Larry Miller, United's Chicago-area Vice President for Channel Management). At that time United was already an approved vendor to Standard Register. At the meeting, Hogan explained he would need a vendor to provide sales support if Standard Register were to re-enter the office supplies business. Miller volunteered that United was able to provide that support. Hogan was later told by

6

his upper management that if re-entry into the office products business was approved, management was leaning toward contracting solely with United. However, no agreement was ever reached by Standard with United and Standard has not re-entered this business.

Under Ohio law:

> A contract is generally defined as a promise, or a set of promises, actionable upon breach. Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration. A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract.

*Minster Farmers Coop. Exch. Co. v. Meyer*, 117 Ohio St. 3d 459, 464, 884 N.E. 2d 1056 (2008), cited by Standard Register at Motion, Doc. No. 41, PageID 182. Texas law is not materially different, *Id.* at 183. There was no binding contract between Enable and Standard Register because there was no meeting of the minds as to amount of products to be sold, length of time of the relationship, or price. There was not even agreement that Standard Register was going to re-enter this line of business.

In opposition to the Motion, Enable quotes Hogan's deposition testimony to show there was agreement on "freight, service, time of pricing, payment terms, provision of marketing catalogues, same-day delivery, and minimum orders." (Hogan Depo. at 41-43, quoted Memo. Opp., Doc. No. 50, PageID 970.) This shows no more than that there was active consideration and negotiation for a program, not that one was every agreed on. This testimony is more a recitation of standard terms of doing business – if business is going to be done – than the terms of a deal agreed upon. Enable quotes Mr. Wood's deposition testimony about his understanding of how firm the deal was, but this is all post-litigation reconstruction of events. Enable presents no objective evidence of mutual assent, whether in the form of an integrated signed contract or even a series of emails agreeing on all material terms. In contrast, the correspondence Wood received from Hogan during the

7

negotiations emphasized how upper management approval would be needed.

Enable asserts that Hogan had authority to bind Standard Register to a deal and its quotes Mr. Wood's deposition on that point. *Id.* PageID 973. But the quotation proves Standard's point, not Enable's. Wood testified he didn't really talk about Hogan's authority with Hogan. Instead, Hogan told him the "first step" was to become a Standard Register vendor which was hard to do. While Wood testifies he only dealt with Hogan, he never testifies Hogan told him that Hogan had the authority to agree to a program on behalf of Standard Register. Finally, as to any asserted apparent authority of Hogan to bind Standard Register, Enable points to no facts from which a jury could reasonably conclude that Standard Register held Mr. Hogan out as authorized to make such a deal, but it is the principal's acts on which apparent authority must rest. *Master Consol. Corp. v. BancOhio National Bank*, 61 Ohio St. 3d 570, 576-577, 575 N.E. 2d 817 (1991).

On Enable's breach of contract claim, there is no genuine dispute[2] as to any material fact and Standard Register is entitled to judgment as a matter of law because there was no agreement – no meeting of the minds – on the essential terms of the asserted contract.

In Ohio, the elements necessary to establish a claim for promissory estoppel are: (1) a clear and unambiguous promise; (2) reliance upon the promise by the promisee; (3) reliance by the promisee that is both reasonable and foreseeable; and (4) injury to the promisee as a result of the reliance. *Weiper v. W.A. Hill & Assocs.*, 104 Ohio App. 3d 250, 661 N.E. 2d 796 (Ohio App. 1st Dist. 1995). Texas law is not materially different.

Enable does not offer any evidence in its Memorandum in Opposition which would permit a jury to find that it had received a clear and unambiguous promise from Standard Register on which it justifiably relied. There is therefore no genuine dispute as to any material fact and Standard

---

[2]Note that the language of Fed. R. Civ. P. 56(a) changed here on December 1, 2010, without changing the standard for granting summary judgment. See Advisory Committee Notes for 12/1/2010 amendment.

8

Register is entitled to judgment as a matter of law on Enable's promissory estoppel claim.

## United Stationers' Motion

Enable sued United Stationers for interference with existing business relations (Count C) and interference with prospective business relations (Count D). In addition to the facts recited above, the following undisputed facts are relevant to United Stationers' Motion.

As a wholesaler of office products, United Stationers sells only to resellers, not to end users. A national sales force directs it marketing efforts to traditional resellers of office products such as Office Depot, and a Channel Sales group looks for customers who are not primarily office products retailers, but who might want to add them as an additional product line. Larry Miller, working in Deerfield, Illinois, heads the Channel Sales effort. Miller had considered Standard Register a possible customer for some time and used the occasion of a visit by Standard Register personnel at Deerfield in the Spring of 2008 to raise the possibility. He did not know that Wood and Hogan were talking about a possible deal.

As noted above, Wood approached Danny Brooks and Jeff Davis of United Stationers about United becoming the wholesaler who would fill orders placed by Enable on behalf of Standard Register. Brooks told no one else at United Stationers about the conversations, including Larry Miller, with whom he had little or no contact in any event. Unaware of those conversations, Miller made a presentation to Standard Register management in June, 2008, about United Stationers' capabilities. During conversation after making the presentation, he learned that Rusty Wood was a competitor, although Enable was not mentioned. When Wood learned of Miller's presentation, he confronted Miller about calling on Standard Register, but Miller responded that he intended to compete with Wood for the business. As noted above, Standard Register decided not to enter this

business at all.

The elements of tortious interference with a contract are: (1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the contract's breach; (4) lack of justification; and (5) resulting damages. *Fred Siegel Co. L.P.A. v. Arter & Hadden*, 85 Ohio St. 3d 171, 707 N.E. 2d 853 (1999). Ohio has adopted the Restatement of Torts with respect to this tort. *Id.* and *Northeast Ohio College of Massotherapy v. Burek*, 144 Ohio App. 3d 196, 209 (Ohio App. 7th Dist. 2001).

Tortious interference with business relations in Ohio is defined as follows:

> One who, without a privilege to do so, induces or otherwise purposely causes a third party not to enter into, or continue, a business relation with another, or perform a contract with another is liable to the other for the harm caused thereby.

*Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.,* 862 F.2d 597 (6th Cir. 1988), quoting *Heheman v. E. W. Scripps Co.*, 661 F.2d 1115 (6th Cir. 1981), quoting *Juhasz v. Quik Shops, Inc.*, 55 Ohio App. 2d 51, 379 N.E. 2d 235 (Summit Cty. 1977). *Juhasz* is cited favorably in *A & B-Abell v. Columbus/Cent. Ohio,* 73 Ohio St. 3d 1, 651 N.E. 2d 1283 (1995). The interference must be intentional, not negligent. *MedCorp, Inc., v. Mercy Health Partners,* 2009 Ohio App. LEXIS 806 *9 (Ohio App. 6th Dist. Mar. 6, 2009).

The Ohio Supreme Court has recognized that "fair competition may constitute a proper ground, or justification, for an interference with an existing contract that is terminable at will." *Fred Siegel*, 85 Ohio St. 3d at 179, citing Restatement of Torts 2d which provides at § 768:

> "(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
>
> "(a) the relation concerns a matter involved in the competition between the actor and the other and
>
> "(b) the actor does not employ wrongful means and

10

>"(c) his action does not create or continue an unlawful restraint of trade and
>
>"(d) his purpose is at least in part to advance his interest in competing with the other."

The same fair competition privilege applies *a fortiori* to a business relationship which has not ripened into a contract. The Texas law on interference with business relations does not differ materially from Ohio.

United Stationers asserts the undisputed facts bring its behavior clearly within the fair competition privilege. Both it and Enable were competing for Standard Register's potential business. There is no evidence it used improper means to compete or that it was attempting to create or perpetuate a restraint on trade. United Stationers had no purpose beyond trying to create a successful business relationship for itself with Standard Register.

In response, Enable argues United Stationers used improper means to compete and violated "the recognized ethical codes and established customs or practices in its industry regarding poaching customers of a customer." (Memo. in Opp., Doc. No. 56, PageID 1025.) To prove the ethical code or established customs or practices of this industry, Enable relies entirely on the deposition testimony of Danny Brooks. Enable's theory of wrongful conduct by United Stationers is that once Wood and Brooks began to talk about the "tripartite deal" which Wood had constructed as his model of how to do business with Standard Register, it somehow became unethical "customer poaching" for United Stationers to compete with Enable in attempting to sell to Standard Register.

While Wood evidently hoped that some such arrangement would be worked out, there is again no evidence of any agreement by United Stationers not to compete with Enable – no joint venture or partnership papers, no non-disclosure agreement, no record of any three-way discussions involving all of these parties. There is no evidence that Enable ever communicated any business information to United with the expressed intention of confidentiality or that United ever used any

11

Enable business information, confidential or not, against it in competing for the Standard Register business.

Furthermore, Enable cites no evidence from which a jury could reasonably infer the existence of an ethical code or custom which forbade what happened here. Neither Brooks nor Wood provided competent testimony of any such code or custom, but merely that this was the only time Brooks had heard of such a situation.

This is not a situation like that where one of several joint venturers appropriates to itself a business opportunity of the joint venture. While Rusty Wood evidently hoped something like a joint venture would develop, it had not done so by June, 2008. And the evidence is unequivocal that to the extent Standard Register constituted a business opportunity, Larry Miller's approach to Standard was entirely independent of any conversations between Wood and Brooks.

In sum, United Stationers conduct constituted fair competition and is privileged under the law. There is no genuine dispute of fact on that issue and United is entitled to judgment as a matter of law.

## Conclusion

Each Defendant's summary judgment motion is granted. The Clerk shall enter final judgment in favor of the Defendants and against the Plaintiff, dismissing the Complaint herein with prejudice.

December 31, 2010.

s/ **Michael R. Merz**
United States Magistrate Judge